FARRELL LINES INCORPORATED, Plaintiff,

v.

HIGHLANDS INSURANCE COMPANY, Jomark Textiles, Inc., and N. B. F. Import-Export Co., Defendants.

HIGHLANDS INSURANCE COMPANY, Plaintiff,

v.

M/V EXPORT AMBASSADOR, her engines, boilers, etc.,

v.

FARRELL LINES INCORPORATED, Defendant.

Nos. 81 Civ. 0601, 81 Civ. 0613.

United States District Court, S. D. New York.

Feb. 8, 1982.

Haight, Gardner, Poor & Havens, New York City, for Farrell Lines Inc.; Chester D. Hooper, Keith L. Flicker, New York City, of counsel.

Vincent, Berg, Russo, Marcigliano & Zawacki, New York City, for Highlands Ins. Co.; Stephen A. Frank, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

These two consolidated admiralty actions were tried upon stipulated facts to determine the liability for damage to and loss of cargo. Farrell Lines, Inc. ("Farrell" or "carrier") received aboard its oceangoing vessel "Export Ambassador" at New York City, a shipment of 556 cartons of shoes from Jomark Textiles, Inc. for transportation by sea to the Port of Monrovia, Liberia pursuant to a bill of lading. The vessel arrived at Monrovia on March 28, 1980. The shipment was discharged between March 28 and March 30 to the stringpiece by stevedores retained by Farrell. The stevedores' participation in the cargo delivery ended at the stringpiece. Farrell and the vessel lost physical custody and control of the cargo upon its discharge by the stevedores. Actual delivery of the cargo to the consignee was not made by the carrier; rather, at the stringpiece, the cargo was received by the National Port Authority of Monrovia ("NPA") which transported the goods to its warehouse and later made delivery to the consignee. NPA is a Liberian governmental entity that has exclusive authority for the regulation of the Port of Monrovia and directs and controls all activities conducted at the Port. The NPA's regulations govern the activities conducted at the Port.

At the discharge from the vessel to the stringpiece of the 556 cartons shipped, tallies conducted by the NPA listed 7 cartons short and 24 cartons damaged and pilfered, for a total loss of $5,197.50. Several weeks later, on May 6, 1980 when the goods were received into the transit warehouse at the Port of Monrovia, the NPA issued its warehouse receipt indicating receipt of 456 car-

tons, with exceptions for 100 non-delivered cartons and 256 cartons damaged and pilfered, for a total loss of $60,558.75.

Highlands Insurance Company paid the full amount of the loss to the shipper and commenced an action as subrogee against Farrell to recover the amount so paid. On the other hand, Farrell commenced an action for a declaratory judgment limiting its liability for the damage sustained to the cargo while in its physical custody or control and declaring that it is not liable for the damages to the cargo or its nondelivery subsequent to its delivery to the stringpiece when NPA took control. The dispute is over whether Farrell is liable for the pilferage and shortage that occurred after it no longer had physical control of the discharged goods and while it was in the custody of the NPA. As the parties state it, "should Highlands ... recover $5,197.50 or $60,558.75." The Court holds its recovery is limited to $5,197.50.

Upon the facts here presented, the terms of the Harter Act govern and Farrell was under a duty to effect a "proper delivery" of the cargo to the consignee.[1] However variously stated by the parties, the basic issue is whether such "proper delivery" was made when Farrell discharged the goods to the stringpiece at the vessel's berth at the Port and physical custody and control passed to NPA.

■ As a general rule, proper delivery by the carrier contemplates delivery of the cargo to the consignee or designee set forth on the bill of lading, at a fit and proper wharf, with the duty upon the carrier to give reasonable notice to the consignee that the cargo has arrived, with a reasonable opportunity to pick it up, and a duty on the consignee to receive the goods at the place of outturn.[2] But this general rule of proper delivery is subject to a well-recognized exception where custom, regulation or law of the port otherwise provide. As stated by the Supreme Court,

No rule is better settled than that delivery must be according to the custom and usage of the port, and such delivery will discharge the carrier of his responsibility.[3]

A host of cases have followed that doctrine.[4]

■ Highland seeks to place liability upon Farrell for the total loss by relying upon Section IV–84(2) of the Monrovian port regulations[5] which provide:

Cargo shall only be regarded as landed when placed and safely deposited in the Transit Warehouse or at a place designated by the Port Manager, and until then delivery of the cargo shall not be considered to have been made to the Authority.

However, this self-exoneration clause from the point of delivery of the cargo until it is "safely deposited" in the warehouse would emasculate the well-established rule re-

---

1. 46 U.S.C. §§ 190–96; *see Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168 (5th Cir. 1981); *F. J. Walker Ltd. v. Motor Vessel "Lemoncore,"* 561 F.2d 1138, 1142 (5th Cir. 1977); *Levantino Co. v. American President Lines*, 337 F.2d 729, 729–30 (2d Cir. 1964); *British West Indies Produce, Inc. v. S/S Atlantic Clipper*, 353 F.Supp. 548, 550, 552 (S.D.N.Y.1973); *Tan Hi v. United States*, 94 F.Supp. 432, 434 (N.D. Cal.1950).

2. *F. J. Walker Ltd. v. Motor Vessel "Lemoncore,"* 561 F.2d 1138, 1142 (5th Cir. 1977); *Calcot, Ltd. v. Isbrandtsen Co.*, 318 F.2d 669, 673 (1st Cir. 1963); *Tan Hi v. United States*, 94 F.Supp. 432, 434–35 (N.D.Cal.1950).

3. *Constable v. National Steamship Company*, 154 U.S. 51, 63, 14 S.Ct. 1062, 1067, 38 L.Ed. 903 (1894).

4. *See, e.g., Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168 (5th Cir. 1981); *F. J. Walker Ltd. v. Motor Vessel "Lemoncore,"* 561 F.2d 1138, 1144 (5th Cir. 1977); *Black Sea & Baltic General Ins. Co. v. S. S. Helenic Destiny*, 500 F.Supp. 677, 678 (S.D.N.Y.1980); *David Crystal, Inc. v. Cunard Steam Ship Co.*, 223 F.Supp. 273, 281–82 (S.D.N.Y.1963), *aff'd*, 339 F.2d 295 (2d Cir. 1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965); *Tan Hi v. United States*, 94 F.Supp. 432, 434 (N.D.Cal. 1950).

5. Port Regulations of the National Port Authority, Liberia (1974).

ferred to above that where delivery is compelled according to custom and usage of the port, the carrier is discharged of its responsibility. Highlands' argument that the regulation governs the determination of when delivery occurred disregards the actual fact that Farrell, in accord with mandatory port practice, lost physical custody and control of the cargo upon its delivery to the stringpiece and that, thereupon, it was received by NPA for delivery to the consignee. Thus, Highlands would ignore local custom and practice and would substitute a local regulation in place of the Harter Act as the authority for determining when "proper delivery" occurred.

■ Additionally, this would go counter to the terms of the bill of lading which provided:

> It is agreed that delivery by the Carrier ... shall take place upon discharge from vessel to a safe lighter or dock and that responsibility of the Carrier ... shall altogether cease when the goods have been discharged and possession is received or taken by Customs or other authorities.... It is agreed that when possession of the goods is received or taken by the Customs or other authorities ... such authority or person shall be considered as having received delivery of the goods solely as agent of and on behalf of the shippers/consignee at the risk of the goods.

Highlands' fundamental error is in disregarding that the Harter Act governs and under its requirements in accord with port custom and usage, "proper delivery" was made at the stringpiece.

The Fifth Circuit Court of Appeals in *Allstate Ins. Co. v. Imparca Lines*[6] addressed the issue here presented upon substantially the same facts as follows:

> The evidence in this case shows that the INP is an organization of the Venezuelan government which has the sole responsibility of unloading, storing and delivering all cargo destined for Puerto Cabello. In other words, once the unloading of the cargo from the vessel commenced, the carrier had nothing further to do with the cargo. And, indeed, the evidence shows that the carrier was powerless to interfere with the exclusive operation of the port by the INP.

We conclude that the point of delivery as defined by the bill of lading coincides with the point of delivery as defined by the Harter Act and the case law. In this case, the delivery occurred, at the latest, when the cargo was placed on the dock in the custody of INP—the point described in the bill of lading—which coincides with the custom and usage of delivery at that port—the point described by the case law. We conclude the evidence overwhelmingly supports the district court's finding of fact that the container was unloaded from the vessel and placed on the dock in the control of INP. This constitutes delivery as a matter of law, in accordance with the bill of lading and the custom and usage of the port.

This disposition makes it unnecessary to consider Farrell's alternative contention that even if it were found that delivery did not take place at the stringpiece, nevertheless, Farrell is not liable for damages to the cargo while in the possession of NPA, as those damages were without Farrell's actual fault or privity and without the fault or neglect of Farrell's agents or servants as provided under COGSA.[7]

■ Highland Insurance Company is entitled to recover only the sum of $5,197.50. Judgment may be entered accordingly.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

**6.** 646 F.2d 166, 169 (5th Cir. 1981).

**7.** 46 U.S.C. § 1304(2)(q). *See generally Allstate Ins. Co. v. Imparca Lines*, 646 F.2d 166, 168 (5th Cir. 1981); *Leather's Best Inc. v. S. S. Mormaclynx*, 451 F.2d 800, 816 (2d Cir. 1971).